Morning, Your Honors. May it please the Court, Chuck Nation on behalf of the appellants, Kelly. Kelly. I'd like to address first the issue of damages. There are very clear law on this matter. This is another bankruptcy appeal, huh? Yes, Your Honor. Okay. The three points are very clear are that the nondischargeability is narrowly defined and confined to its terms, that the fraud found has to bear some relationship, a nexus, approximate cause to the damages, and you have to relate those damages to the fraud itself, and that that burden is on the plaintiff. In re Sirianni, Reuben John Deere cited in the briefs clearly make that point. They state that the purpose of this section is not to punish the debtor with the kitchen sink approach, but to establish continuing liability for those damages that arise from the fraud in question. Well, didn't the – there were quite extensive – we're shifting gears here, but I thought in this case there were quite extensive findings by the bankruptcy judge, weren't there? Yes, and they were all in favor of the Kellys until the final one. They found that there were no findings against Lori Kelly on either of the Kellys as to the financing statements, as to the materials that they provided, no affirmative misrepresentations. Those were all found by the court not to be sustained causes of action. The court made a single specific finding, which was that the court was, quote, shot, close quote, that a licensed contractor, George Kelly, would not have personally disclosed the fact that permits had not been issued on two properties. There were seven properties that were secured by this. There was $3.5 million in equities. Permits, and there was a stop order. On a single property. Yeah, and I thought that the district court, the bankruptcy court, found that they relied on that property. The court, exactly, the court found that there were exactly two properties in question, and then they threw in an entire set of loans that had no rational relationship to those two properties whatsoever. But those loans, sorry, the two properties were collateral for the loans at issue, weren't they? They had a specific limitation signed twice by the plaintiff in this action. The limitation was solely created by him and his agent, and the court had that information. I don't know what you mean by the limitation. They were collateral for the loans, weren't they? Those two were collateral for the loan, and on Exhibit 72 it specifically states that the only portion of security from the various properties is identified. There was $100,000 available for the fourth place property. There was $200,000 for the boulevard property. But if J.A.W. says they wouldn't have made these loans at all if they had known that those properties didn't have permits, then where's the causation problem? Well, they said there is a single broad statement made three years after the fact by Mr. Williams to that effect. However, all of the evidence, all of the facts, all the documents, and all the agreements, all in writing made at the time upon which you can establish that there was any reliance, were not to that effect. They were to the effect that there was a maximum of $100,000 on fourth place. What does that mean? I don't know what you mean by that. You have to allocate the damages that related to the fraud. The court found there was no fraud with regard to Highland properties. There were three residential properties. The court found there was no fraud with regard to the Palms property and the Church property. Those provided $500,000 of specified security. If you look at Exhibit 72, it specifies that only— But so what do you think we should do, take some kind of ratio of the— You absolutely have to, Your Honor. The Sirianni and all those cases specifically state that it is only damage that relates from the fraud that you can find. Well, wait. I'm reading from the bankruptcy court. This is—it says, particularly the court is troubled by Mr. Kelly's failure to disclose his lack of permits in the city of Escondido stop work notice and notice of violation for the Boulevard property. Williams believed the Boulevard property to have substantial equity and the value of this property was a substantial factor in his decision to make the loan. Is that clearly erroneous, or what do we do with that? Well, again, if you look at Exhibit 72, it identifies $3.5 million in equity, but then it specifically identifies as the amount of equity securing the loan. There's a column for that. It is limited to the Boulevard property at $200,000. It's limited on Fourth Place to $100,000. Then on Exhibit 8, there is a release clause which says, if you pay $100,000 on Fourth Place, it is released from security. And if you look at— But they didn't. But the question is this. Is there some rational relationship between $600,000 versus this $300,000, which is the maximum limitation prescribed by Williams, the plaintiff, as the value that he was asserting related to securing that loan? So it sounds like you're saying it should have been 50 percent of the damages, about $300,000 out of $600,000? I'm saying that—and I'll get to some of the other damage elements. The damages under Sirianni, Rubin, and Deere say there has to be some relationship from the fraud in question to the damage. Did you propose an alternative damages amount that used this ratio that you're describing? We provided the evidence on that. The court asked if there had been a calculation done as she presented her verbal, and, of course, there wasn't because we had no idea. We would have had to have gone through 36 permutations. You have to go one times, two times, all the way up to the seven properties and provide a calculation of damages on every permutation. But, again, that's not the defendant's duty or burden. That was the duty of the plaintiff to establish. Now, the court should have said, all right, Mr. Williams, now show me which of these damages arise. But, again, on those— Are you saying you gave a formula? You argued for this ratio kind of formula idea and gave a formula even if you didn't know which ones to plug in? We had no ability to do anything except say that there were no damages except what was applied here under 72 and 8 and under Exhibit 68, which is where they calculated their damages. But you didn't do any calculations at that time. I did not and could not because we were arguing that we had not committed any violation and there was no identification. We could only present the evidence of what damage related to what property. We did that. It's undisputed. So where do we find this calculation in your bankruptcy filing? In the bankruptcy file you'll find you can—there's not a calculation made. Again, I would have had to have— Well, where is the argument for a general formula? Is it made to the district court? It's simply in the paperwork that the damages have to be related to this issue. And what we've said is that if you look at Exhibit 72 and Exhibit 8, they say there's a limit on them. If you then look at Exhibit 68, which is the calculation of damages that the court applied, that's the calculation that the court applied, and they said, is it there? We said yes. Okay? On that page, on Exhibit 68, it identifies the fact that there are damages of $14,982 for foreclosure, $49,000 and $2,000 for advances. Those are all undisputed, uncontradicted, made with regard to the Church and Palms properties. They have nothing to do with the Fourth Street— I'm sorry, Fourth Place or Boulevard properties. In addition, this is money that wasn't loaned. There's a $27,631 bonus that Williams claimed he was entitled to from the residential property on Highland that he's included. So we have over $93,000 of completely unrelated principal, which the court included. The court simply said, I don't have another calculation, and looked at me. That's not the Kelly's responsibility. The law says the plaintiff has to identify the damages that arise from the fraud. In this case— But wouldn't it be— Why don't you say, well, we'll provide one, Your Honor? Let me point it to you. Because it was—because I said— It's often the plaintiff's burden. Crossing a crosswalk, you know, when the traffic is coming and you get killed. Well, no, and I understand that you could be right, but you're dead right to the argument. But at that point in time, Your Honor, this was all brand new. The court had taken several days and then stepped up to the microphone, gave all these findings that we hadn't done anything, and then in the very last one said, it's specific as to George Kelly for this purpose, for these two properties. At that point in time, I did say it's these properties, but that's all. There's nothing else. There was no more evidence that was being taken. There was no more argument being allowed. This was the findings of the court after we had argued. Damages are usually the plaintiff's burden, but it's very normal for a defendant to have an expert who has an alternative damages calculation. Your Honor, I cannot—without jumping up and down, I can't make it any more harsh that we had no ability to do that. You're talking about us going in and saying, well, if you've got Highland, but not these five and this one, so there's one, then we would have had 36 different permutations of damages. And they would have all been different, and they would have been completely uncalled for. Well, did this—you appealed to the district court? Yes. The district court affirmed? The district court didn't hear argument, didn't do anything. It simply said, yes, we've affirmed the bankruptcy. Well, you wrote something to the district court. Yes. So where do we find where this calculation is in that? The calculation, per se, is not there. It's the same argument that the damages that were required have to be addressed from this exhibit and that the damages were improper. Why didn't you do the calculation then? Why don't you do it before the district judge? You had plenty of time then. We did not have an opportunity to orally argue, but the answer is— Well— No, no, I understand, Your Honor. Yes, I did, and it got missed. I can't tell you why the actual physical calculation isn't there. I can tell you that all of these numbers are on Exhibit 68 and that they're crystal clear because we argued you can't have this kitchen sink damage. You can't just take— Can I ask you a different question on a different topic because you're going to run out of time here? If the $30,000 payments each month had continued, could your clients have continued making the mortgage payments? Yes. The entire situation here was, and the evidence is, again, contradicted and undisputed. The Kellys went to Gillette-Williams and said, We need $500,000 because we're $30,000 a month upside down. We'll only do the residential properties. They came back and said, No, we want everything you've got as additional collateral security. That's over $3 million. We'll take $800,000 for a $520,000, et cetera. As a practical matter, two things. I want to address that $30,000 issue because that addresses Lori Kelly and the $30,000 note. The court found that none of the financing statements or anything Lori Kelly signed were correct. I have a different issue with this. The $30,000 was supposed to be made, and it was absolutely part of this modification agreement. There was no consideration. So you've argued there was no consideration so they shouldn't have to pay the $30,000 back that happened in that last payment. But why aren't you arguing that they caused the bankruptcy altogether and you shouldn't have to pay any of it because of that? We did. That is the argument that we made to the trial court. Look, the $30,000 was due. She found that the modification agreement was valid. That's the problem. But I understand your argument to be the modification agreement is not valid so we don't have to pay back that last $30,000. Where are you arguing that they caused the entire problem and so you don't have to pay any of it because of the failure to continue to pay the $30,000 that they owed? I don't see you making that argument. I can't remember. I apologize for not remembering the citation, but I cite to this court the fact that there is a case that argues directly the contrary of Mr. Williams, which is if you are stuck with bankruptcy or financial ruin as your only alternative, that in fact is duress. The court found that the definition of duress under the law... Right, but that's the reason you're arguing it's duress and so we should not consider that last $30,000 as a payment you have to make. I'm sorry. She made a separate finding that that was an additional basis for fraud so I want that gone, but it is also inherent in that and part of the argument. You can't do that. We were entitled to $30,000 for six more months to make these payments, but the court found that because they found that that agreement was valid, we couldn't get around it when the court says that agreement binds you. We don't have $30,000 for six more months coming, which we were entitled to. The whole basis of the loan was that there should have been $30,000 a month. Did you ever argue specifically if they had continued making these $30,000 payments, none of this would have happened? We would have still had the properties? Well, yes, generally. I mean, the argument was there, but the bottom line was that the court didn't want to have any argument about that because they said you had a disagreement. I'm sorry? Wouldn't that have been a difficult argument to make? No. Given everything that happened in the historical context? The historical context, this is very, very clear and simple. These people had $3.5 million in equity. They certified it with $800,000 on an escape route release clause basis, and they took all this extra collateral, and the market collapsed. That's what caused this. If they had continued to make the $30,000 payments, it would have gone out several more months when the market started to come back eventually. Would it have been sufficient? I don't know, but it certainly was not any kind of fraud or dispensation with regard to Highland Church or Palms. Williams got Church and Palms back. He got $75,000 identified on Exhibit 8 as return money that is not credited against the principal. It's in violation of Exhibit 7 that says you first apply to interest. We've more than helped you use your time, I think. Thank you, Ron. If I may, on the one issue that I didn't get an opportunity, just on Lori Kelly, the findings to the court were that George Kelly did this. There is no finding that Lori Kelly had the knowledge or did the concealment. Thank you. Thank you. Good morning. May it please the court. Stephen Michelli for JAW Land and Trading, the Apley. Speaking to that, yeah. I'm a little bit taller than Mr. Nishin, so I'll move it up. Pull it down just a little. Pull it down a little bit. Good. All right. Thank you. Excuse me for my cough. I have a little bit of a cold. We would ask the court to affirm the decision of the bankruptcy court and as affirmed by the district court that the debt was non-dischargeable owed to my client due to the fact that the original loan was procured through fraud and the modification, the $30,000, was procured through a misrepresentation. The original loan was procured through fraud because the Kellys, to obtain one loan secured by seven properties, did not disclose that most of the properties had problems. The Kellys were in the business of fixing up properties and then selling them or renting them out. Mrs. Kelly and Mr. Kelly were in the business together for nine years. That's how long they were married and they were in the business. Before this loan was made, Mrs. Kelly was intimately involved in the business throughout the whole time. When this loan was made, on at least one of the properties, Mr. Kelly was being prosecuted for violating a stop work notice on the boulevard property, which had a conversion from a motel to apartments. That was in violation of zoning and taking the carports and turning them into apartments without permits. None of this was disclosed to Mr. Williams. The bankruptcy court found, which was supported by evidence, that if Mr. Williams had known that Mr. Kelly had done work to these properties in violation of zoning laws and without permits, he would not have made the loan at all. So even if we agree with you about that, non-dischargeability is an equitable remedy that you're seeking. And I'm worried about whether your client has unclean hands and is not entitled to that remedy, because you had a contract that said you'd pay $30,000 every month to help them pay the mortgage payments, and that's what you knew the $30,000 was for because of the history of the negotiation. And you stopped paying the $30,000, and then they stopped paying the mortgage payments, and that's what caused the bankruptcy that you're now seeking to non-discharge. So it seems like you're part of the problem here, and I'm struggling with whether we can give you this remedy. Well, let me disagree with your characterization there for a couple of reasons. One is that the contract, which is reflected in the escrow instructions, which is the only place where it discusses this $30,000 a month payment, gave Mr. Williams the option to make advances or not. It specifically says at his discretion. But more importantly— I don't read it that way. It says you're going to make these $30,000 payments every month, and that was what the contract was. It specifically says that. So more importantly, though, the evidence was clear that when the Kellys obtained this loan in September, their plan was not to make payments on the senior loans. And beginning with the October 1st payment on all their loans, they made half payments to the lenders because in their mind they thought if they were delinquent, they could negotiate loan modifications with the lenders. So even though they were supposed to use this money to make the payments to the senior lien holders, they did not— But why—the answer to your question was why didn't you pay them the $30,000? Pardon me? Why didn't you have your clients pay them the $30,000 a month? Well, by March, when the $30,000 payment agreement was made, where the agreement was, I will make you an additional payment if you promise that you'll pay the—you'll keep the senior loans current. They represented that to JAW, to Mr. Williams, and he made the payment. But it was very clear in the evidence that at that moment they were—Mrs. Kelly knew they were so far behind in making their payments that there was no way that she was going to catch up. But they—that's true. They were making partial payments. They were negotiating. But it was all still floating until you stopped making the payments that they were using to make the payments. Well, there's no evidence to suggest that. The evidence is that they were desperate because they knew they were losing everything. In other words, there is no evidence that would support the argument that if further $30,000 payments were made, that they would have been able to turn things around because by then they had already— Your client was obligated to make those payments. Well, two things happened. Am I right or wrong about that? No. No. In the escrow—well, two things happened. I'm wrong? Is that what you're saying? Yes. He was not obligated to make the payments for two reasons. Yeah. One was the escrow—our position, and the bankruptcy judge agreed, was the—he was not obligated to make any more advances, number one. And number two, there was a modification agreement where the parties agreed that this would be the last advance, and so they agreed that he wouldn't have to make any more additional advances. But that's—they had no choice because you were saying, I'll give you one more payment or I'll give you no more payments. And so they said, okay, we'll give us one more payment. But there was no consideration. You had an obligation to continue making payments. So I don't see how you can rely on the modification agreement to get yourself out of this problem. I'd also like to ask you about—so page five of the escrow agreement, it says, on the first of each and every month thereafter for 11 months, the sum of $30,000 per month will be funded. So I don't understand how you say that the contract doesn't say that you have to do that. In my brief, I point to the language—I point to the language— There's some other footnote that seems to be about a different issue as I read it. There is language in there that talks about the—other language that talks about the discretion. But let me address the point directly that you're making. Mr. Williams did not cause the Kellys financial problems. They caused the financial problems by not making their payments for months and months before March of 2009. And the contract provided and the Kellys agreed that they would not—that Mr. Williams, the J.W., would not have to make any more payments. And you can't—and they misrepresented— What was the consideration for that agreement? Well, the consideration—two things. One is we don't believe under the California law consideration was necessary to make that modification to the existing contract. And we cited that law in our brief. The second thing is that in the escrow agreement, it provides that the—in other language besides the language that you quote— and the bankruptcy court agreed that there was no requirement to make the additional payment. But before the payment was made, they reached this—in other words, there's a dispute. They had this—if they had a dispute, if they had a dispute, let's say the Kellys said, well, you need to make the payment to me. And Mr. Kelly says, no, I don't. Well, then they enter into an agreement which resolves that dispute, which is I'll make the payment, but I don't have to make any more and you have to make—bring the—or keep the senior loans. That was when? That was in March of 2009. Nine. Okay. And when did—when did your client find out that this—what is it, the prospect—the one that was—that didn't have the building permits and had a stop order, that that—all that had happened? Well, they first found out that the Kellys were seriously delinquent on their loans after the—J.A.W. made the $30,000 payment in April because it was after that payment was made that Mrs. Kelly provided the loan statements from the lenders showing all of these delinquencies, like months and months of delinquencies. And that—and it was after that point, after that point, April of 2009, that Williams and Mr. Gillette discovered the problems with the permits and the zoning. So it was after March of 2009. Did the court say that you didn't have to continue to make the $30,000 payments? You just said that the bankruptcy court found that, and I'm not finding that in the decision. I might just be missing it. Do you know, is there a page where the bankruptcy court held that? I'm not sure if it was expressed or it was implied in her rejection of their argument that it didn't have to be made. Well, you said the bankruptcy, what the bankruptcy court said. Now you're telling us that the bankruptcy court didn't say it. It's implied. I'm not prepared right now to, as I stand here, to point exactly to what the bankruptcy court said about the consideration issue. Well, your job is to answer our questions. I appreciate that. Right. The bankruptcy, the district court pointed out that the consideration and the duress arguments weren't raised to the bankruptcy court. And so in the district courts, I believe the consideration and the duress arguments were not raised. So because the bankruptcy court. We're asking you about possible unclean hands concerning your clients. Well, the bankruptcy court didn't find any unclean hands. Well, we're a court of equity. Okay. Well, I understand. And I don't. Because in my opinion and in Mr. Williams' opinion, he didn't need to make that payment because the arrangement was that he would make the $30,000 payments on a discretionary basis. And every month they would ask, which is what they did. The evidence is in the record that they did ask every month. And then he would make the payment that he would make the advance. Where's the evidence in the record that they asked every month that wasn't triggered by the contract? Well, the fact of the matter is that, and I think that Mr. Kelly testified or Mr. Gillette testified that one of them testified that every month they would ask. In other words, whether or not it was triggered, they would ask every month for their payment. Do you know where that is in the record?  Okay. I can provide it afterward if you wish in a letter brief. That would be good. You do that. Or I'll tell you what the status of the record is about the request for the payment. Because that would be helpful to me. I read it as a contract obligation. So if they actually didn't interpret it that way as the parties, that would be interesting to know. Do you also want me to point out where in the escrow instructions? Well, you already did that, and I didn't think it was relevant to this point. So no need to do that. My colleagues might feel differently. No? Okay. Go ahead. Send us what you want to send us. So I don't believe that there was any finding and there was evidence to support that Williams had unclean hands. The loan was procured through fraud. And he never would have made a loan in the first place if he had known that Mr. Kelly and Mrs. Kelly, that their practice was to make these changes in violation of zoning and permits. And it also affected the value of the security. It goes on all the time in Los Angeles. It may, but the only evidence in this case was- Probably in the country, too. Right. Well, Mr. Williams, who's in the auto business for years, is not in the business of making loans. He's in the auto business, so he ought to know a lot of things. I think if you asked him, he probably would say he's never sold a defective car that he didn't replace. You're the one that's saying it. I didn't say it. So I think there's support in the record for the bankruptcy court's decision, and there's no support for taking away that bankruptcy court decision because of some unclean hands on behalf of Mr. Williams. Let me make a couple of points real quick on the damages question. The Cohen Supreme Court case, which I cited, indicates that if the debt was procured through fraud, you don't split it up, you don't do a ratio. It's the entire debt, whatever that's owed. And that postdates all the cases that they cited. Were there expert reports on damages? There were no expert reports. On either side? On either side. Mr. Gillette, the real estate broker who was also the collection agent, he prepared Exhibit 68. Which was his calculation of the amounts that were owed. There's no evidence whatsoever in the record contradicting anything that's on that. And there's no evidence in the record parsing out the loan. I would point out that in- The bankruptcy court is, in a sense, an equity court, too. Yes, Your Honor. I wanted to just point out that at the end of their appellant's, their reply brief, or in their reply brief, they raised this issue of waiver and the anti-deficiency laws. And I wanted to point out that that was not raised in the bankruptcy court, so it was waived. It was not raised in the appellant's brief on this appeal, so it was waived. The only time it was mentioned was at the end of the reply brief in front of the bankruptcy court, or the district court. And the district court said it was waived, but in a footnote, footnote 7, addressed the issue and said anti-deficiency laws don't apply when the issue is, was a loan procured by fraud. And so those laws don't even apply. And the one case they cite, Cadlerock- Your time is up. Okay, thank you. Right on 13, did you say that? You did. Could I make one statement? Okay. The Cadlerock case, which is the only case that they cite, does not agree with the law that they cited for and found in favor of the creditor. Thank you very much. Thank you. You've got a minute. With regard to the issue of the duty to pay, if you look at exhibit 8 on the first two pages, there is a specific signed documentation that says that it is upon the request and it's at the discretion of the borrower to deliver the rest of the money, not Mr. Williams, the lender. That is consistent with the fact that it's a $520,000 total loan. $520,000 was recorded as full security on seven properties, and it's also consistent with the language in the-I'm sorry, the notice fully signed and with the language in the escrow. The footnote that they refer to consistently as exonerating them was a reference to the start of escrow before the escrow closed that the escrow instructions themselves did not constitute the obligation. The obligation doesn't arise until escrow is closed, the note signed, and then those terms become part of the agreement. There's an absolute duty to do that. With regard to the identification of whether or not the $30,000 a month would have been sufficient, again, all the numbers are on exhibit 68. If you look, Williams advanced $49,000 to keep the matters current. The residential properties were already sold, and the $49,000 that he advanced kept current on his properties, and that was done by June. They would have received $90,000 by that date, not just $49,000, so that identifies that. Lastly, the court's finding, as I quoted on page 7 of the opening brief, found that if Gillette had been accurate, the loans would never have been made. And with regard to submitting additionals, I can provide calculations based exclusively on exhibit 68 in conjunction with the question. Thank you. You can do that for us. So are we going to defer submission until they give us the piece of paper that you would like to give us? And the other side will have an opportunity. So you get it to us within 10 days, and they'll have 10 days to respond. I wonder if I could ask, the only thing that I heard that we would be submitting, a supplemental letter. He's going to submit it. Oh, he's going to submit it. You're going to submit it. Well, you were going to submit it. He's given you a chance to respond. No, I understand. It's just I don't understand what issue he's submitting his brief on. I'm not sure. I'm super submitting calculations based on his exhibit. Calculations. Oh, okay. And in my response, then I would address the one issue you wanted to. Well, I'd like to see where in the record you can show that the parties thought that they needed to ask every month for the $30,000. So that's what I think you're submitting. I guess he's submitting calculations, and probably you will say it's too late. But you can do whatever you want in response to his calculations. Right. And I'm not sure that I said the parties thought they had to ask. I'm saying, as a matter of fact, they did ask. Right. Well, if you can show us that they did, that would be evidence that they thought they had to. Okay. And then so I would put that in my response to his supplemental brief. So 10 days for his brief or his supplemental brief? Yeah, that's right. And then 10 days for mine. And I'll have an opportunity to respond to his. Is that correct? You know, if you're not talking into that breathalyzer. It's my understanding that Mr. Michelli will submit something within 10 days, as will I. We'll cross in the mail to each other or e-mail, and I'll have an opportunity to respond to his and he to mine. That makes sense. Yeah, that's fine. Thank you. Okay. And I'll have a chance to respond to his. Yeah, he will give you plenty of chance. Just give us simultaneous supplemental submissions, and then you can each, within 10 days, and you can each have 10 days or 7, whatever, 10 days to respond to each other. Does that make sense? And we'll defer submission. It's not very complicated. We're at 10 and 10. Thank you, Your Honors. Thank you. 10 and 10 and 10. Okay. All right.
judges: Schroeder, Pregerson, Friedland